## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF NEW JERSEY

**ASHLEY KIM,**
23822 Sapphire Canyon Road
Diamond Bar, California 91765

No. _____

       **Plaintiff**

       v.

**THE TRUSTEES OF PRINCETON
UNIVERSITY,**
Princeton University
Princeton, NJ 08544

          **Defendant**

## NOTICE OF REMOVAL

Defendant The Trustees of Princeton University (the "University") hereby files this Notice of Removal pursuant to 28 U.S.C. §§ 1332 and 1441, *et seq.* The grounds for removal are as follows:

1.      Plaintiff commenced this action against the University by filing a civil action complaint on August 7, 2025 in the Superior Court of New Jersey, Chancery Division, Mercer County. That matter is captioned at Case ID. No. MER-C-000078-25, and a copy of the Verified Complaint ("Complaint") is attached to this Notice as **Exhibit A**.

2.      As pled, Plaintiff is a citizen and resident of California. Complaint at 1.

3.      The University is a private university organized under the laws of the State of New Jersey with a principal place of business in Princeton, New Jersey. Complaint ¶ 2.

4.      On the face of the Complaint, Plaintiff is a citizen of a different state than the Defendant.

5.      Plaintiff does not plead a specific amount in controversy in the Complaint. Given the subject matter of the Complaint, and the demands in the Complaint for "counsel fees and

52913741.1

costs of suit" and equitable relief which she seeks in order to pursue applications to medical school and her lucrative chosen profession as a doctor, the only reasonable interpretation of the Complaint is that Plaintiff is seeking more than $75,000 in damages, and therefore more than $75,000 is in controversy. *See In re Corestates Trust Fee Litigation*, 39 F.3d 61, 65 (3d Cir. 1994) ("In injunctive actions, it is settled that the amount in controversy is measured by the value of the right sought to be protected by the equitable relief"); *Florham Village LLC v. New Jersey CVS Pharmacy LLC*, No. 15-8758, 2016 WL 3965203, *2 (D.N.J. July 21, 2016) (clarifying that this is "measured from plaintiff's point of view").

6.      As this is a civil action between citizens of different states, and the amount in controversy exceeds $75,000, this Court has original jurisdiction over the matter based on diversity of citizenship. 28 U.S.C. § 1332.

7.      Under 28 U.S.C. § 1441, "any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or defendants, to the district court of the United States for the district and division embracing the place where such action is pending." 28 U.S.C. § 1441(a).

8.      Pursuant to 28 U.S.C. § 1441, "[a] civil action otherwise removable solely on the basis of [diversity jurisdiction] may not be removed if any of the parties in interest *properly joined and served as defendants* is a citizen of the State in which such action is brought." 28 U.S.C. §1441(b)(2) (emphasis added).

9.      The Complaint has not been properly served on the University. A copy of the docket from the state court proceedings in this matter as of the time of the filing of this Notice is attached as **Exhibit B**.

10.     As a result, the provisions of 28 U.S.C. § 1441(b)(2), commonly referred to as "the forum defendant rule," are inapplicable to the instant matter. The University, although a New Jersey citizen, has not been "properly joined ***and served***" in the state court action. *See* 28

U.S.C. § 1441(b)(2); Encompass Ins. Co. v. Stone Mansion Restaurant Inc., 902 F.3d 247, 153-54 (3d Cir. 2018) (holding that removal to federal court was appropriate where defendant's notice of removal was filed prior to accepting service in the state court action).

11.     This Notice of Removal is being filed within thirty (30) days of the filing of the Complaint and within one year of the commencement of the action, and therefore is also timely under 28 U.S.C. § 1446(b).

12.     A true and correct copy of this Notice will be promptly filed with the Superior Court of New Jersey, Chancery Division, Mercer County, pursuant to 28 U.S.C. § 1446(d).

13.     Finally, a copy of this Notice is being promptly served on Plaintiff, pursuant to 28 U.S.C. § 1446(d).

WHEREFORE, pursuant to 28 U.S.C. §§ 1332 and 1441 *et seq.*, Defendant respectfully requests that Plaintiff's civil action be removed from the Superior Court of New Jersey, Chancery Division, Mercer County to the United States District Court for the District of New Jersey.

Respectfully submitted,

*James A. Keller*
SAUL EWING LLP
1500 Market Street
38th Floor West
Philadelphia, PA 19102
James.Keller@saul.com
215-972-1964

Dated: August 7, 2025

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing Notice of Removal was served today on the following via electronic mail and first class mail, postage prepaid, addressed as follows:

Stephen J. Edelstein, Esq.
Weiner Law Group LLP
629 Parsippany Road
Parsippany, New Jersey 07054-0438

*James A. Keller*

Dated:  August 7, 2025                              James A. Keller

52913741.1

# Exhibit A

Stephen J. Edelstein, Esq.
Attorney ID# 285031972
Weiner Law Group LLP
629 Parsippany Road
P. O. Box 438Parsippany, New Jersey 07054-0438
(973) 403-1100 (973) 403-0010 (fax)
Attorneys for Plaintiff Ashley Kim
5388140

| | |
|---|---|
| **ASHLEY KIM,**<br><br>    **Plaintiff,**<br><br>  **vs.**<br><br>**THE TRUSTEES OF PRINCETON UNIVERSITY,**<br><br>    **Defendant.** | **SUPERIOR COURT OF NEW JERSEY CHANCERY DIVISION: MERCER COUNTY DOCKET NO.:**<br><br>**CIVIL ACTION**<br><br>**VERIFIED COMPLAINT** |

Plaintiff Ashley Kim, residing at 23822 Sapphire Canyon Road, Diamond Bar, California, complains of the Defendant as follows:

### THE PARTIES AND THE NATURE OF THE ACTION

1.     Ashley Kim ("Ms. Kim") is a residential student at Princeton University. She is a member of the Class of 2027.

2.     The Trustees of Princeton University ("Princeton University" or "the University") is the chief governing body of Princeton University.   The address of the University is Princeton University, Princeton, New Jersey.  Princeton is located in Mercer County, New Jersey.

3.     This matter is brought as a summary proceeding pursuant to Rule 4:67.

## UNIVERSITY DOCUMENTS

4.      The University has issued a publication entitled "Rights, Rules, Responsibilities."

("the Publication").

5.   Section 1.1.1 of the Publication states, *inter alia*:

> At Princeton, disciplinary proceedings have a role that is
> subordinate to positive guidance, rational admonition, and
> reasonable appeal to members of the University to observe its stated
> norms. The disciplinary system establishes procedures for fair
> hearing, including advising individuals fully of the charges against
> them, affording them ample opportunity to speak on their behalf,
> and requiring a clear explanation of their rights of appeal.
> Disciplinary proceedings are instituted only for violations of
> standards of conduct defined in advance and published, or for
> actions that can be reasonably deduced as violations in light of those
> specifically defined as such. Regulations governing the conduct of
> members of the University community will be revised only after
> deliberations in which representatives of the appropriate groups are
> invited to participate.
>
> **Since rigid codification and relentless administration of rules
> and regulations are not appropriate to an academic community,
> the rules and policy statements that follow serve mainly to
> clarify commonly accepted standards of conduct within the
> University.** [emphasis added]

6.      The Publication, at Section 1.1.7, also itemizes a number of formal sanctions for

violations of rules of conduct.

7.      One of the formal sanctions is "Suspension (Not Served)." The Publication states

that:

> Suspension (Not Served) is imposed in situations where conduct
> violations are otherwise serious enough to merit Suspension, but
> where the appropriate disciplinary body determines that the
> immediate separation of the student from the University may not be
> warranted. Relevant factors that may be considered include, but are
> not limited to, the nature and seriousness of the violation, the nature
> and/or seriousness of any prior violation(s), or other circumstances
> that the body applying the sanction finds sufficient to permit
> Suspension (Not Served).

2

If a student is issued a Suspension (Not Served) as a sanction, they will not be separated from the University, provided that they are not found responsible for a subsequent significant policy violation. If a student is issued a Suspension (Not Served) as a sanction and they are found responsible for a subsequent significant policy violation, the student will be required to serve both the Suspension from the first infraction and the Suspension from the subsequent infraction; this would likely result in a separation of one or two years, or Expulsion.

**A Suspension (Not Served) is recorded on a student's transcript even if the student does not have a subsequent infraction and therefore does not serve the Suspension (i.e., they are not separated from the University). Relevant information remains on the student's permanent record at the University and may be disclosed by the Office of the Dean of Undergraduate Students or the Office of the Dean of the Graduate School in response to requests for which the student has given permission or as otherwise legally required.** [emphasis added]

8.       Section 2.3.1 of the Publication is entitled "Jurisdiction over Undergraduates for Violations of Academic Rules and Regulations." It provides that "All examinations, tests, and quizzes that take place in class are conducted under the honor system. All violations of the honor system are the concern of the Undergraduate Honor Committee."

9.       The Undergraduate Honor Committee is governed by a Constitution. A copy of that Constitution is annexed as Exhibit A.

10.      When required, the Constitution calls for a Hearing before seven (7) students – the Chair and six (6) other members of the Committee appointed by the Chair. Constitution, Article II(D)(2)(a).

11.      According to the Constitution, "[a] student will be found responsible if the Committee finds **overwhelmingly convincing evidence** that the student ought reasonably to have understood that their actions were in violation of the Honor Code." Constitution, Article II(D). [emphasis added]

3

12.    According to the Constitution, "[a]t least six of the seven members must be **overwhelmingly convinced** that the student in question is responsible for the student in question to be found responsible." Constitution, Article III (D)(3)(a)(i).  [emphasis added]

13.    Consistent with the information in the Publication, one of the forms of discipline is "suspension (not served)." Article IV (A)(1).

14.    The Constitution purports to limit the basis for appeals, in the event that a student is aggrieved by the outcome of a hearing, providing that "[a]ppeals can only be made on the grounds of procedural unfairness or harmful bias." Article IV(B)(A)(2).

15.    Together, the Publication and the Constitution are referred to, *infra*, as the University Documents.

## THE CASE OF ASHLEY KIM

### a.  The Process

16.    Ms. Kim, who hopes to attend medical school, was enrolled in CHM 304, titled "Organic Chemistry II: Foundations of Chemical Reactivity and Synthesis."

17.    The course was taught by Dr. Sandra L. Knowles.

18.    The final exam was administered on May 13, 2025.

19.    On May 15, 2025, Dr. Knowles informed the Honor Committee, by email, that the exams of two students "were almost identical . . . ."  One of the exams was that of Ms. Kim.  The other exam was that of a student identified only as SIQ B.  The issue had been brought to Dr. Knowles' attention by her grader.

20.    It is not remarkable that the response to two exams would be similar, or even identical.  Ms. Kim and SIQ B attended the same lectures, took notes, and worked on practice

4

problems. Each student was permitted to bring one page of handwritten notes ("crib sheet") to the exam.

21.     In response to this purely circumstantial allegation, Ms. Kim flatly and staunchly denied that she had copied answers from SIQ B.

22.     An investigation into Dr. Knowles' allegation of cheating was conducted on May 16, May 22, May 30, and June 3, 2025.

23.     In addition to Dr. Knowles and Teaching Assistant Lauren Harstad, neither of whom could offer any testimony to where Ms. Kim or SIQ B sat, the "Investigative Summary" which was prepared and which is annexed as Exhibit B, summarizes information from "Witness A," "Witness B," "Witness C," SIQ B, and Ms. Kim.

24.     According to the Investigative Summary, Witness A said that SIQ B sat "two seats to the left" of her, with Ms. Kim behind them.

25.     Witness A did not notice anything unusual during the exam. The Investigative Summary noted that Witness a stated that she "did not think anyone could have copied based upon how the room was set up."

26.     Witness B "did not notice anything unusual during the exam" and "was not paying attention to those around them."

27.     Witness C sat near SIQ B. She "didn't notice anything unusual." She did not think that anyone near her or her friends got up and left during the exam. According to the Investigative Report, Witness C stated: "I'm sorry I can't be more helpful. I was focused on being done with my last exam and didn't talk to or pay attention to anyone else other than my friends that day."

28.     SIQ B stated that she was not sure if Ms. Kim sat one or two rows behind her.

29.     SIQ B speculated that perhaps she and Ms. Kim had similar one page "crib" sheets.

30.     SIQ B provided no information about Ms. Kim's conduct, stating that she "was so focused on the exam I really didn't observe anything."

31.     Ms. Kim indicated that she sat two rows behind SIQ B and that there would simply have been no way for her to cheat, adding "I couldn't have looked at her paper the way the seats are set up."

32.     Neither Dr. Knowles, nor her teaching assistant Ms. Harstadt, nor Witness A, nor Witness B, nor Witness C, nor SIQ B said that they saw Ms. Kim copy anything from SIQ B's paper, and Ms. Kim denied having done so.

33.     On June 12, 2025, the Honor Committee convened a hearing, via Zoom.

34.     Hearing the matter were the Chair, Nadia M., and six members appointed by her.

35.     On June 16, 2025, the Committee Chair issued a written "Decision Summary," which is annexed as Exhibit C.

36.     As is clear from the Decision Summary, there still was no one who claimed to have seen Ms. Kim copy from SIQ B's test paper, and Ms. Kim offered alternative explanations for why the test answers were similar.

37.     According to the Decision Summary, "[t]he Committee considered the mechanics of how copying could have happened and explored all possibilities."

38.     In doing so, the Committee noted a conflict between Ms. Kim's testimony, which was that she sat two rows behind SIQ B, while some others were unsure is she sat two rows behind or one row behind.

39.     All agreed that SIQ B, who is right-handed, was seated in a seat with a left-handed desk.

6

40.    The configuration of seats and students was depicted in the Decision as follows, using a one-row distance rather than a two-row distance, as Ms. Kim had stated:



41.    Even this depiction, however, reveals that SIQ B, sitting at a chair with a left-handed desk, would have had her exam as far away from SIQ A (Ms. Kim) as possible and would almost certainly have had her back between Ms. Kim and the exam paper.

42.    When asked, Witness A "had said they did not think it would have been possible to copy off a student a row in front . . . ." Decision, at Page 9.

43.    At this point, the Decision reports: **"[H]owever a student on the Committee who took the very same exam voiced that it would have been possible to see an exam from the row in front."** Decision, at Page 9 [emphasis added].

44.    The Decision indicates, at Page 10: "Ultimately, the Committee found that even in the absence of certainty about the exact method, the standard of 'documented evidence and

7

plausibility of method' was met . . . . The Committee determined that there was no other reasonable explanation for such similarities."

45. The Committee found Ms. Kim responsible for a violation of the Honor Code by a vote of 7-0. Decision, at Page 9. It imposed a penalty of "suspension (not served)," which resulted in a permanent, negative mark on Ms. Kim's record and the loss of her grade in CHM 304.

46. Ms. Kim then exhausted her internal remedies, consisting of an appeal to the Dean of Students, who refused to grant her any relief.    Her internal remedies are now exhausted.

### b. The Standards of Procedural Unfairness and Harmful Bias

i.    **Procedural Unfairness**

47. Article III(D)(3)(a)(i) of the Honor Committee Constitution establishes the standard of proof for Committee decisions. At least six of the seven Committee members must be "overwhelmingly convinced that the student in question is responsible for the student in question to be found responsible."

48. Despite this requirement, the Decision never once articulates *any* standard of proof, and the phrase "overwhelmingly convinced" does not appear in the Decision at all.  In fact,  the Committee uses the phrase "absence of certainty."

49. Given the uncertainty about where Ms. Kim sat, whether she could have seen SIQ B's paper at all, the complete lack of testimony that Ms. Kim was seen cheating in any fashion whatsoever, the minute nature of the examination responses, and the alternative explanations offered by Ms. Kim, the mandatory standard "overwhelmingly convinced" could not possibly have been applied.

**ii.**     **Harmful Bias**

50.     The only evidence in the entire case that Ms. Kim could have seen SIQ B's test paper came not from a witness but from "a student on the Committee who took the very same exam . . . ."

51.     That student Committee member then voted against Ms. Kim, since there were seven members on the Committee and the vote was 7-0.

52.     The student in question brought his own harmful bias to the decision-making process, plainly violating one of the two articulated bases for appeal.

## FIRST COUNT

### (Breach of Contract)

53.     Plaintiff repeats the allegations of Paragraphs 1 – 52 as if set forth at length.

54.     The mutual obligations between the University and the Plaintiff, as set forth in the University Documents, constitute a binding contract between the parties, supported by valid, mutual consideration ("the Contract").

55.     The obligations of the University, in this context, are exercised in part by the Student Honor Committee and in part by the University officials who review the Committee's process and outcomes.

56.     The University, by failing to follow the rules established in the Publication and the Constitution, committed material breaches of the Contract.

57.     As a result of those breaches, Plaintiff Ms. Kim suffered and will continue to suffer damages, including but not limited to an unwarranted and permanent mark on her record branding her as having cheated on an examination as well as the loss of her earned grade in CHM 304, both

9

of which circumstances will continue to haunt her throughout her academic career at the University, her applications to graduate school, and her chosen profession.

58.     For these damages, Ms. Kim has no adequate remedy at law.

**WHEREFORE**, Plaintiff Ashley Kim demands judgment on this FIRST COUNT against the Defendant Trustees of Princeton University for an Order of this Court

(a) permanently vacating the Decision of the Committee;

(b) permanently deleting any reference to the Decision on any of Ms. Kim's records;

(c) isolating and sealing all records of the Committee and the University related to the work of the Committee as it relates to Ms. Kim, including any record of her internal appeal;

(d) Permanently enjoining the University, its officials, and any of its internal committees, from revealing the underlying charge against Ms. Kim and/or the outcome of the Committee and the resulting appeal, to anyone, exactly as if it had never taken place;

(e) granting Ms. Kim an earned grade in CHM 304 based on her examination score earned by the answers on her examination, without any reference to the allegations of cheating;

(f) counsel fees and costs of suit;

(g) such other relief as the Court deems just and proper.


## SECOND COUNT

### (Breach of Covenant of Good Faith and Fair Dealing)

59.     Plaintiff repeats the allegations of Paragraphs 1 – 58 as if set forth at length.

60.     Every New Jersey contract, including the contract formed between the University and Ms. Kim, includes a covenant of good faith and fair dealing.

61.     By its actions, as aforesaid, the University breached the covenant of good faith and fair dealing implicit in is contract with the Plaintiff Ms. Kim.

62.     As a result of those breaches, Plaintiff Ms. Kim suffered and will continue to suffer damages, including but not limited to an unwarranted and permanent mark on her record branding her as having cheated on an examination as well as the loss of her earned grade in CHM 304, both of which circumstances will continue to haunt her throughout her academic career at the University, her applications to graduate school, and her chosen profession.

63.     For these damages, Ms. Kim has no adequate remedy at law.

**WHEREFORE**, Plaintiff Ashley Kim demands judgment on this SECOND COUNT against the Defendant Trustees of Princeton University for an Order of this Court

(a) permanently vacating the Decision of the Committee;

(b) permanently deleting any reference to the Decision on any of Ms. Kim's records;

(c) isolating and sealing all records of the Committee and the University related to the work of the Committee as it relates to Ms. Kim, including any record of her internal appeal;

(d) Permanently enjoining the University, its officials, and any of its internal committees, from revealing the underlying charge against Ms. Kim and/or the outcome of the Committee and the resulting appeal, to anyone, exactly as if it had never taken place;

(e) granting Ms. Kim an earned grade in CHM 304 based on her examination score earned by the answers on her examination, without any reference to the allegations of cheating;

(f) counsel fees and costs of suit;

(g) such other relief as the Court deems just and proper.


## THIRD COUNT

### (Deviation from Established University Rules and Regulations)

64.     Plaintiff repeats the allegations of Paragraphs 1 – 63 as if set forth at length.

65.     As set forth in the Publication, "the rules and policy statements that follow serve mainly to clarify **commonly accepted standards of conduct within the University**."  See, Paragraph 5, *supra*.  [emphasis added]

66.     A student such as Ms. Kim is protected by these commonly accepted rules and policy statements and, correspondingly, bound by commonly accepted standards of conduct.

67.     Together, the Publication and the Constitution form the associational rules by which both the student and the University are bound.

68.     In the case of Ms. Kim, as aforesaid in detail, the University failed to abide by the associational rules which it created and by which both Ms. Kim and the University are bound and treated her unfairly.

69.     As a result, Plaintiff Ms. Kim suffered and will continue to suffer damages, including but not limited to an unwarranted and permanent mark on her record branding her as having cheated on an examination as well as the loss of her earned grade in CHM 304, both of which circumstances will continue to haunt her throughout her academic career at the University, her applications to graduate school, and her chosen profession.

70.     For these damages, Ms. Kim has no adequate remedy at law.

**WHEREFORE**, Plaintiff Ashley Kim demands judgment on this THIRD COUNT against the Defendant Trustees of Princeton University for an Order of this Court

(a) permanently vacating the Decision of the Committee;

(b) permanently deleting any reference to the Decision on any of Ms. Kim's records;

(c) isolating and sealing all records of the Committee and the University related to the work of the Committee as it relates to Ms. Kim, including any record of her internal appeal;

(d) Permanently enjoining the University, its officials, and any of its internal committees, from revealing the underlying charge against Ms. Kim and/or the outcome of the Committee and the resulting appeal, to anyone, exactly as if it had never taken place;

(e) granting Ms. Kim an earned grade in CHM 304 based on her examination score earned by the answers on her examination, without any reference to the allegations of cheating;

(f) counsel fees and costs of suit;

(g) such other relief as the Court deems just and proper.

## FOURTH COUNT

### (Lack of "Overwhelmingly Convincing" Evidence, as Required by University Rules and Regulations)

71.     Plaintiff repeats the allegations of Paragraphs 1 – 70 as if set forth at length.

72.     The record of this matter makes it completely clear that no witness saw Ms. Kim copy from SIQ B's paper and no witness testified that Ms. Kim could have copied from SIQ B's paper.

73.     Although the standard of proof required by the Constitution is "overwhelmingly convincing," the Decision makes no such finding and, in fact, never refers to this or any other standard of proof.

74.     In fact, a finding of "overwhelmingly convincing" evidence would have been completely unsupportable based on the record.

75.     Because the Committee did not apply the correct standard of proof, and because, further, the correct standard of proof could not have been met, the Committee and the University both failed to abide by University Rules and Regulations, to Ms. Kim's detriment, and the entire proceeding was unfair.

76.     As a result, Plaintiff Ms. Kim suffered and will continue to suffer damages, including but not limited to an unwarranted and permanent mark on her record branding her as having cheated on an examination as well as the loss of her earned grade in CHM 304, both of

which circumstances will continue to haunt her throughout her academic career at the University, her applications to graduate school, and her chosen profession.

77.     For these damages, Ms. Kim has no adequate remedy at law.

**WHEREFORE**, Plaintiff Ashley Kim demands judgment on this FOURTH COUNT against the Defendant Trustees of Princeton University for an Order of this Court

(a) permanently vacating the Decision of the Committee;

(b) permanently deleting any reference to the Decision on any of Ms. Kim's records;

(c) isolating and sealing all records of the Committee and the University related to the work of the Committee as it relates to Ms. Kim, including any record of her internal appeal;

(d) Permanently enjoining the University, its officials, and any of its internal committees, from revealing the underlying charge against Ms. Kim and/or the outcome of the Committee and the resulting appeal, to anyone, exactly as if it had never taken place;

(e) granting Ms. Kim an earned grade in CHM 304 based on her examination score earned by the answers on her examination, without any reference to the allegations of cheating;

(f) counsel fees and costs of suit;

(g) such other relief as the Court deems just and proper.

## FIFTH COUNT

### (Harmful Bias, Prohibited by University Rules and Regulations)

78.     Plaintiff repeats the allegations of Paragraphs 1 – 77 as if set forth at length.

79.     The Constitution prohibits the Committee reaching a decision which relies on or evidences "harmful bias."

80.     Despite this prohibition, the Committee, faced with no witness who saw Ms. Kim copy from SIQ B and with no witness who stated that Ms. Kim could have copied from SIQ B, relied instead on the bias of a voting member of the Committee who informed the Committee, out

of the presence of Ms. Kim and contrary to the testimony of every other witness, that he was in the exam room and in his opinion she could have seen SIQ B's test paper.

81.    This testimony by the unnamed Committee member constitutes harmful bias.

82.    As a result, Plaintiff Ms. Kim suffered and will continue to suffer damages, including but not limited to an unwarranted and permanent mark on her record branding her as having cheated on an examination as well as the loss of her earned grade in CHM 304, both of which circumstances will continue to haunt her throughout her academic career at the University, her applications to graduate school, and her chose profession.

83.    For these damages, Ms. Kim has no adequate remedy at law.

**WHEREFORE**, Plaintiff Ashley Kim demands judgment on this FIFTH COUNT against the Defendant Trustees of Princeton University for an Order of this Court

(a) permanently vacating the Decision of the Committee;

(b) permanently deleting any reference to the Decision on any of Ms. Kim's records;

(c) isolating and sealing all records of the Committee and the University related to the work of the Committee as it relates to Ms. Kim, including any record of her internal appeal;

(d) Permanently enjoining the University, its officials, and any of its internal committees, from revealing the underlying charge against Ms. Kim and/or the outcome of the Committee and the resulting appeal, to anyone, exactly as if it had never taken place;

(e) granting Ms. Kim an earned grade in CHM 304 based on her examination score earned by the answers on her examination, without any reference to the allegations of cheating;

(f) counsel fees and costs of suit;

15

(g) such other relief as the Court deems just and proper.

WEINER LAW GROUP LLP
Attorneys for Plaintiff
Ashley Kim

By: _____
        Stephen J. Edelstein
        A Member of the Firm

Dated: 8/6/25

## CERTIFICATION PURSUANT TO RULE 4:5-1

Pursuant to R.4:5-1, I hereby certify that the matter in controversy herein is not the subject to any other action pending in any Court or any pending arbitration proceeding. No other action or arbitration proceeding is contemplated.

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willingly false, I am subject to punishment.

WEINER LAW GROUP LLP
Attorneys for Plaintiff
Ashley Kim

By: _____
        Stephen J. Edelstein
        A Member of the Firm

Dated: 8/6/25

16

## DESIGNATION OF TRIAL COUNSEL

In accordance with R. 4:25-4, Stephen J. Edelstein, Esq. is hereby designated as trial counsel for Plaintiff Ashley Kim in this matter.

WEINER LAW GROUP LLP
Attorneys for Plaintiff
Ashley Kim

By: _____
Stephen J. Edelstein
A Member of the Firm

Dated: 8/6/25

## CERTIFICATION OF COMPLIANCE WITH R. 1:38-7

I certify that confidential personal identifiers have been redacted from documents now submitted to the Court and will be redacted from all documents submitted in the future in accordance with R. 1:38-7(b).

WEINER LAW GROUP LLP
Attorneys for Plaintiff
Ashley Kim

By: _____
Stephen J. Edelstein
A Member of the Firm

Dated: 8/6/25

17

## ☐VERIFICATION

Ashley Kim, of full age, hereby certifies as follows:

1. I am the Plaintiff in this matter.

2. I have read Verified Complaint and am familiar with its contents. I have personal knowledge that the allegations set forth in the Verified Complaint are true.

3. I certify that the above statements made by me are true. I am aware that if any of the foregoing statements are willfully false, I am subject to punishment.

_____

Ashley Kim

Date: 8/6/25

# EXHIBIT A

Case 3:25-cv-14302-MAS-RLS    Document 1    Filed 08/07/25    Page 25 of 52 PageID: 25
MER-C-000078-25   08/07/2025 12:19:06 PM   Pg 20 of 45   Trans ID: CHC2025252523

8/6/25, 12:30 PM                                    Constitution | Honor Committee

# Honor Committee

# Constitution



Adopted by the Undergraduates in 1893. Amended in 2012, 2014, 2015, 2017, 2018, 2019, 2020, and 2022. Revised in 2015.

## Article I - Charter and Composition of the Honor Committee

### A. Charter

1. The Honor Committee consists of up to 18 members who will represent the student body and address all suspected violations of the Honor Code.

### B. Composition

1. The members of this Committee will be one member of the class government from the sophomore, junior, and senior classes, two members of the first-year class, and members to be appointed from the student body at large until the Committee consists of eighteen members.
   a. Normally, the sophomore class president will join the Committee after their election and serve for a one-year term. After that term, they may apply for reappointment.
      i. If the sophomore class president is not reappointed to the Committee for their junior year, the incoming junior class Vice President will take their place.
   b. If the sophomore class president is not re-elected as junior class president, the incoming junior class president will take their place on the Committee. The outgoing sophomore class president may apply for reappointment if there is an open space on the Committee.
   c. The junior class government member on the Committee will also serve a one-year term, with the option for reappointment.
2. Appointed members.

a. The first-year class members will be appointed in the fall semester by a subcommittee comprising the Honor Committee Chair, Honor Committee Clerk, an additional senior class member of the Honor Committee, one to three voting members of the Undergraduate Student Government Executive Committee as selected by the Undergraduate Student Government President and Academics Chair, and one or two elected student representatives on the Honor Committee.

    i. In the case that one or more of the elected student representatives on the Honor Committee is unable to serve on the subcommittee, two other positions shall be allocated corresponding to an additional member of the Honor Committee and an additional voting member of the Undergraduate Student Government Executive Committee. Under these circumstances, the additional member of the Honor Committee should be a senior class member if at all possible.

    ii. In the case that a senior class member is unable to serve on the subcommittee, the Honor Committee chair shall select another member of the Honor Committee.

b. Following spring Undergraduate Student Government elections, the Honor Committee will solicit applications from the student body at large.

    i. The same subcommittee that selects first-year class members will select the other appointed members as well.

c. Appointed members will serve one-year terms, but may seek reappointment thereafter. Committee members seeking reappointment may not participate in the selection process. All members of the Committee excluding the members up for reappointment will reach consensus on whether to retain appointed members or to replace them with a new applicant.

d. All appointments are subject to approval by the Undergraduate Student Government.

3. Ex officio members.

a. The newly elected sophomore and junior class presidents and the newly appointed members will normally become members of the Committee at the beginning of the fall term following their election/appointment, but, if needed, can serve on the Committee immediately after their election.

## C. Dismissal and Replacement of Members

1. The Committee may dismiss a member for neglect of duty. A vote of twelve of the seventeen other members is required for such a dismissal. If any member becomes unable to serve for any reason, or is dismissed, a new member will be appointed by the Honor Committee as explained in Article 1, Section B, subject to approval by the Undergraduate Student Government. Any member who becomes unable to serve or is dismissed for neglect of duty must go through the same selection process as a new applicant if they wish to rejoin the committee.

## D. Clerk, Chair and Chair Emeritus

1. **Clerk.** Every academic year, after the first of December, a subcommittee comprising the Honor Committee Chair, Honor Committee Clerk, two voting members of the Undergraduate Student Government Executive Committee as selected by the Undergraduate Student Government President and Academics Chair, and the two longest-serving elected student representatives on the Honor Committee will select a sophomore member of the Committee to serve as Clerk of the Honor Committee during the following spring and fall semesters. This subcommittee will interview all interested sophomore members of the Committee and appoint one sophomore by a majority vote. This sophomore member will automatically become a member of the Committee the following year. In the event that the Clerk withdraws from the University, or is otherwise unable to serve as Chair, the subcommittee described above will convene to select a new Clerk from the Committee members in the spring semester of their sophomore year or fall semester of their junior year.

a. In the case that one or more of the elected student representatives on the Honor Committee is unable to serve on the subcommittee, two other positions shall be allocated corresponding to an additional member of the Honor Committee and an additional voting member of the Undergraduate Student Government Executive Committee. Under these circumstances, the additional member of the Honor Committee should be a senior class member if at all possible.

b. In the case that a senior class member is unable to serve on the subcommittee, the Honor Committee chair shall select another member of the Honor Committee.

2. **Chair.** The Clerk will become the Chair of the Honor Committee at the beginning of the spring semester in their junior year. In the event that the Chair withdraws from the University, or is otherwise unable to serve as Chair in the spring semester of their junior year, the Chair Emeritus will serve as Chair until they graduate, at which time the Clerk will become Chair. In the event that the Chair withdraws from the University, or is otherwise unable to serve as Chair, in the fall semester of their senior year, the Clerk will become Chair.

3. **Chair Emeritus.** The former Chair will take on an advisory role, in addition to their responsibilities as a committee member, as Chair Emeritus during the spring semester of their senior year, to guide the new Chair. The Chair Emeritus may serve as acting Chair if needed.

4. **Evaluation.** Each Honor Committee member that is not currently nor ever has been the Clerk or the Chair will be afforded ONE opportunity to "evaluate" the Clerkship or Chairship. The evaluation process will proceed as follows:

   a. A member of the Honor Committee will initiate the process by providing a statement outlining their reasons for the evaluation to both the Undergraduate Student Government Senate President and the sitting Chair of the Honor Committee. The member should declare upon submission of this statement whether or not they plan to continue with the subsequent steps of the process, keeping in mind that they are allotted only ONE opportunity to conduct an evaluation.

   b. If the member chooses not to continue with the subsequent steps of the process, the evaluation ends here. If the member chooses to continue with the process, both the member that has submitted the evaluation and the Clerk or Chair then under evaluation will interview before an independent committee. This will only take place provided that the member belongs to the constitutionally appropriate year for the position under evaluation.

   c. The independent committee will be selected by the Undergraduate Student Government President and composed of nine students. Three of these students must have at least one full semester on the Honor Committee, at least one of whom must be a current member of the Honor Committee. The remaining students must be elected Undergraduate Student Government Senate officials.

   d. The independent committee will then determine by a two-thirds vote whether the sitting Clerk or Chair will be replaced in their executive capacity by the member submitting the evaluation.

   e. Should the independent committee choose to change the Clerkship or Chairship, such a change is only to take place the following semester, thereby providing a period for transition during the recess.

   f. The independent committee will release a statement outlining the criteria upon which the outcome was decided, regardless of whether or not there was a change. This will be done with due consideration for confidentiality for all those involved in the process.

# Article II - Violations

A. **The Honor Pledge**

1. The Honor Pledge is as follows: "I pledge my honor that I have not violated the Honor Code during this examination." This must at all times be written in full on the examination paper and signed by the student on the examination.Any undergraduate who fails to write and sign the pledge on the examination paper will be reminded to do so by the instructor. If the instructor or the Committee cannot promptly obtain the written and signed pledge, the student will be reported to the Committee for investigation. Unwillingness to sign the pledge following notification by the instructor or the Committee will be prima facie evidence of a violation of the Honor Code.

B. **Violations**

1. Violations of the Honor Code consist of:
   a. Any attempt to gain an unfair advantage in regard to an examination, both inside and outside the examination room.
   b. Any attempt to give assistance, both inside and outside the examination room, whether the student attempting to give assistance has completed their own work or not.

2. Specific violations include, but are not limited to:
   a. Tampering with a graded exam;
   b. Claiming another's work to be one's own; and
   c. Obtaining or attempting to obtain, previous to any examinations, copies of the examination papers or examination questions, or any illegal knowledge of these questions.
   d. Other actions in violation of the policies set forth by the professor.

C. **Dishonesty**

1. Committing dishonesty, defined as lying to or purposely misleading the Committee, is also a violation of the Honor Code. It will not be considered dishonesty for a student to maintain their own innocence.

D. **Findings of Responsibility**

1. A student will be found responsible if the Committee finds overwhelmingly convincing evidence that the student ought reasonably to have understood that their actions were in violation of the Honor Code.

E. **Reporting Suspected Violations**

Case 3:25-cv-14302-MAS-RLS     Document 1     Filed 08/07/25     Page 28 of 52 PageID: 28
MER-C-000078-25   08/07/2025 12:19:06 PM   Pg 23 of 45   Trans ID: CHC2025252523

8/6/25, 12:30 PM                                    Constitution | Honor Committee

1. Every student is obligated to report to the Honor Committee any suspected violation of the Honor Code that they have observed. The Committee will make every attempt to ensure the anonymity of reporting students. Students may make reports by emailing honor@princeton.edu ✉ (mailto:honor@princeton.edu), contacting the chair directly, or any member of the committee.

# Article III - Investigations and Hearings

A. **Rights for Students In Question Under Investigation.** A student suspected of a possible violation of the Honor Code is referred to as the "student in question."During the investigation and hearing process the rights of the student in question include:

   1. Rights during investigation
      a. The right to be informed that they are under investigation as the student in question before answering any questions.
      b. The right to have a witness present during the initial interview with investigators.
      c. The right to review in advance of the hearing all documents constituting direct material evidence.
      d. The right to call witnesses.
      e. The right to maintain innocence at all times during the process.

   2. Rights during Adjudication
      a. The right to have a representative from the Office of the Dean of Undergraduate Students serve as a procedural adviser prior to the hearing and be present or on call during an adjudication to serve as a nonvoting resource.
      b. The right to choose not more than two current undergraduate members of the University community to serve as a peer representative, including member(s) of the Princeton University Peer Representatives. While the student in question is expected to provide answers to questions, the peer representative may clarify or supplement their answers. The peer representative(s) may also question witnesses. A current member of the Honor Committee may not serve as a peer representative.
         i. The Princeton University Peer Representatives are trained students available to support any student accused of violating the Honor Code.
      c. The right, in the event of a finding of responsibility, to receive a copy of the chair's summary of the case. This summary must outline the charge made against the student, describe the evidence and testimony provided in support of this charge, and provide the rationale for the Committee's finding, both in terms of verdict and punishment assigned.
      d. The right, in the event of a finding of responsibility, to poll the votes of the individual Committee members.
      e. The right, in the event of a finding of responsibility, to listen to any recording made of the hearing.

B. **Confidentiality**

   1. All those involved in the investigation and hearing process are expected to maintain the confidentiality of all student involved in the case.

C. **Investigation Procedures**

   1. Upon receiving a report of a suspected violation, the Chair will appoint members on a rotating basis to conduct a preliminary investigation.
   2. If an allegation of an Honor Code violation is made over the summer, the Committee will make every reasonable attempt to investigate it in a timely manner. All cases that cannot be practically concluded over the summer will resume in the fall.
   3. The appointed investigators may:
      a. Meet with the student or students in question;
      b. Meet with witnesses;
      c. Collect any relevant documents or material evidence;
      d. Obtain any other information bearing on the allegation.
   4. The Chair and investigators shall utilize the help of professional investigators from the Office of the Dean of Undergraduate Students during the course of investigations for tasks including but not limited to collecting relevant witness testimony and compiling investigative summaries.
   5. When making initial contact with a student, the investigators will disclose the student's status as a student in question or a witness. If the student's status changes during the course of the investigation, the investigators will inform them as soon as possible.
   6. The investigators' meeting with the student in question will proceed as follows:
      a. The investigators will explain the rights of the student in question (see III.A. above).
      b. The student in question will be asked to sign a statement prior to a hearing saying they have been informed of their rights under the Honor Constitution.

    c. The student in question will be asked to provide an account of the suspected violation in question.

    d. The student in question will be given a letter, describing the suspected violation in reasonable detail, from the reporting witness. The letter need not be signed.

    e. The investigators will explain the nature of the suspected violation.

7. Upon the completion of the investigation, the investigators in consultation with the Chair will determine whether or not a hearing is warranted.

    a. If a hearing is not warranted, all records of the case that personally identify the student in question or any other student will be immediately destroyed.

    b. If a hearing is warranted, the student may exercise their right of up to seven days of preparation.

## D. Hearing Procedures

1. The place and time of all hearings will be determined by the Chair.

    a. The Committee will make every reasonable attempt to hold and adjudicate the hearing in a timely manner. All cases that cannot be practically concluded over the summer will resume in the fall.

2. The hearing will proceed as follows.

    a. The Chair will preside and will appoint six other members to hear the case.

    b. The Committee will use a recording device to record the proceedings of each case.

    c. The student in question will be given the opportunity to make statements, answer questions, present evidence, and question witnesses.

    d. Members of the Committee may ask questions at any point, seek additional materials or testimony, visit any relevant location, recall or review evidence or testimony provided earlier, and in general seek to obtain any information bearing on the accusation.

    e. The Chair may request that a representative from the Office of the Dean of Undergraduate Students be present or on call during an adjudication to serve as a nonvoting resource.

    f. It is incumbent upon the Honor Committee members to investigate all possible connections between the student in question and all witnesses protecting the confidentiality of all parties involved.

3. After testimony is concluded, the Chair and the six other Committee members who conducted the hearing will deliberate in private. Deliberations will proceed as follows.

    a. The Committee will first deliberate on the question of whether to find the student in question responsible for the violation charged.

        i. At least six of the seven members must be overwhelmingly convinced that the student in question is responsible for the student in question to be found responsible.

        ii. Documented evidence and plausibility of method, in the absence of demonstrated intent, may be enough to convict.

    b. Should the Committee find the student in question responsible, the appropriate penalty will be determined by a majority vote.

    c. After deliberations have concluded, the Committee will inform the student in question of the decision.

    d. If the student in question was found responsible, the Chair will write a summary directed to the dean of undergraduate students. The penalty will take effect upon imposition by the dean of undergraduate students.

4. A student will not be subjected to a second hearing for the same offense, except in light of new and important evidence, as determined by a majority vote of the Committee. The testimony of one individual, without more, will not warrant another hearing.

# Article IV - Penalties

## A. Penalties

Students found responsible for violating the Honor Code will receive penalties in accordance with Rights, Rules, Responsibilities as follows:

1. Typically, Undergraduate students are subject to the following penalties for a first violation of the Honor Code: disciplinary probation, suspension (not served), suspension for one semester, and suspension for one, two or three years. These guidelines are subject to the following exceptions:

    a. Where a student is found responsible for writing overtime on an examination or otherwise gaining a time advantage, the Committee will normally recommend that the student be issued a reprimand and recommend that the student

receive a zero for the examination. However, in especially egregious cases of writing overtime, the Committee may exercise the option to increase the penalty.

    i. A reprimand may be taken into account in judging the seriousness of any future violation.

  b. Where there are extenuating circumstances, the first offense may result in a reduced penalty. Extenuating circumstances may include, but are not limited to, situations where there was a substantial, material error on the part of an agent of the university, and situations where the Committee fails to conclude that a student should reasonably have understood that their actions were in violation of the Honor Code.

  c. If dishonesty occurs, the Committee may exercise the option to increase the penalty.

2. Normally, a second violation of the Honor Code, or a violation of the Honor Code following a suspension for a violation of the University's academic integrity regulations, will result in expulsion from the University.

  a. Students whose first Honor Code or academic integrity violation resulted in a penalty of probation may face either suspension or expulsion should they be found responsible for a second violation of the Honor Code.

3. In cases adjudicated prior to the last day of classes, if the final decision is a separation from the University (e.g., suspension or expulsion), the student will normally not earn credit for the semester in which the infraction occurred. If the case is adjudicated during reading or exam period or if the student has essentially completed course requirements while awaiting the final disposition of the matter, obtaining credit for the semester will be at the discretion of the Committee. In such cases, the Honor Committee will normally recommend that the student receive a failing grade in the course in which the violation occurred.

## B. Appeals

A student found responsible for a violation may appeal the Honor Committee's decision as follows:

1. Only the dean of the college may review the final penalty recommended by the Honor Committee.

2. Appeals can only be made on the grounds of procedural unfairness or harmful bias.

3. An appeal of the decision of the Honor Committee must be directed to the dean of the college in writing within one week of the Committee's decision. A student interested in appealing should first contact the associate secretary of the University to discuss the appeal process.

4. If the dean of the college determines that a penalty of the Honor Committee should be reduced, the dean will make a recommendation to the President, describing the reasons for the proposed modification, and the president will decide whether or not to implement the recommendation.

5. The penalty recommended by the Honor Committee may not be increased upon appeal.

6. In the case of a successful appeal, the Honor Committee will destroy all records of the case that personally identify the student in question or any other student.

## C. Enrollment Status

1. If the student in question is found responsible, and if the appeal does not alter the Committee's decision, the penalty will normally be considered effective as of the date of the original decision.

2. If a senior is found responsible for a violation during the spring reading or exam period, or if the senior has essentially completed all spring course requirements, the senior's degree may be withheld in lieu of suspension. In such cases, the Honor Committee will normally recommend that the student receive a failing grade in the course in which the violation occurred.

3. Under normal circumstances, when a violation requiring suspension occurs during the fall term, the student in question will not be eligible to return until the following fall term. When a violation requiring suspension occurs during the spring term, the student in question will not be eligible to return until the following spring term.

4. Pending a hearing or the student's decision about whether to appeal a separation from the University or the withholding of the degree, and/or while an appeal is in process, an administrative hold will be placed on the student's University transcript. Should the student decide not to appeal a separation or the withholding of the degree, or should an appeal not result in an alteration of the committee's decision to dismiss the student or withhold their degree, the registrar will record the fact of the penalty on the student's transcript.

# Article V - Publications

## A. Constitution Publication

1. The Constitution will be published by the first week of each academic year. It will also be printed in Rights, Rules, Responsibilities, copies of which are issued to all students upon matriculation at the University. In addition, Article II will be circulated immediately before midterm and final examinations.

B. **Publication of Committee Statistics**
  1. Every year, the Committee will publish aggregated, anonymous statistics for the last five years, indicating the number of students reported to the Committee, the types of violations that are reported, the number of cases that go to hearing, the respective outcomes of those cases, the number of appeals made, and the respective outcomes of those appeals.

# Article VI - Amending the Constitution

A. **The Constitution may be amended in the following ways:**
  1. Upon the initiative of fifteen of the eighteen members of the Committee, followed by a three-fourths vote of the Undergraduate Student Government members present at a meeting of the Undergraduate Student Government; or
  2. Upon the initiative by petition of 200 members of the undergraduate body, followed by a three-fourths vote in a student referendum as conducted by the Elections Committee of the Undergraduate Student Government. Article VI can be amended only by such a student referendum.

# EXHIBIT B

**Investigative Summary**
**SIQ Ashley Kim '27**
**CHM 304**
**Student Investigators Minh Truong and Ammaar Alam**
**ODUS Investigator Jamie Sandman**

## I. Overview

CHM 304 is taught by Professor Erik Sorensen, Dr. Sandra L. Knowles and Dr. Robert L'Esperance. The Head TA is Lauren Harstad. The course is titled Organic Chemistry II: Foundations of Chemical Reactivity and Synthesis. The final exam was administered on May 13, 2025. On May 15, 2025, the Honor Committee received an email from Dr. Knowles indicating that she observed irregularities in the final exams of two students. Specifically, Dr. Knowles stated, "...two exams were almost identical in every written/drawn response (for all 10 questions)." The SIQs were identified in the email as Ashley Kim '27 and SIQ B.

## II. Interview Summary Dr. Knowles

Minh Truong and Jamie Sandman interviewed Dr. Knowles via Zoom on May 16, 2025. She stated the following:

CHM 304 meets Mondays & Wednesdays at 11:00 am–12:20 pm in Frick Chemistry Laboratory B02. There was also a weekly precept and a lab. There are 163 students in the course. There were three midterms during the semester each worth 100 points. The lowest grade was dropped so the midterms were worth 200 points total. The final exam was worth 175 points. The lab component was 20% of the grade.

Dr. Knowles explained that she gathered with the teaching assistants on Wednesday, May 14, 2025, to grade the exams. According to Dr. Knowles, "The first thing the grader noted was a drawing that didn't make sense. The next exam she graded had the exact same thing for that question. Then she looked side by side at the two exams and they were very similar." The TA brought the two exams to Dr. Knowles, and they looked at both exams. Dr. Knowles said that the two exams were practically identical in all respects including where the students drew the models on the paper, the scratch marks and the verbiage.

Dr. Knowles said the rules for the exam were on the first page. The students were required to do their own work and sign the Honor Pledge. The exam was closed note and no electronics, but they were permitted to bring one page of handwritten notes to the exam. These notes were not required to be submitted with the exams. The exam was conducted in 10 McCosh and the proctors were not present in the testing room. Dr. Knowles believes that both SIQs took the exam in the general testing room. The SIQs are not in the same precept.

After the third midterm, academic alerts are issued to the students ranked in the bottom 10%. Ashley received an alert, and her total raw score was 111/300 ranking her 142 out of 163. SIQ B did not receive an alert. Their raw score was 173/300 ranking them 101 out of 163. The average score on the final exam was 121.3/175. The highest score was 173. SIQ B scored a 133 and

Ashley a 128. Dr. Knowles said the professors modified the final to make it a little easier than the midterms which improved overall student performance.

Dr. Knowles' observations when comparing the SIQs exams side by side is as follows:

## Problem 1

(b) Dr. Knowles stated that the scratch is nearly the same and also in the same location.

(d-f) Dr. Knowles said the SIQs answers had almost the same wording. Their scratch work was the same and it was also in the same location on the page which was very unusual as compared to the other students in the course.

## Problem 2

(a) Dr. Knowles said most of the answer was drawing molecules. The SIQs had very similar drawings and the same pattern. Dr. Knowles observed that Ashley had a transcribing error. Her error was not uncommon, but it was clear to Dr. Knowles that it was a transcription error. The next part of her answer self-corrected in the drawing on the next line (where the grader wrote "+2").

(b) Dr. Knowles observed that the same scratch work was crossed out on both exams. The answer was written in the same pattern (makes an L shape). She added, "The molecules are in the same placement every time."

## Problem 3

Dr. Knowles stated that the students' drawings are very similar. She said, "They are drawn in the exact same configuration and placement on the page. They have the same notes too." She added that they both included the name of the reaction, "reductive animation", which not everyone did.

## Problem 4

This is the question that raised the initial concern. SIQ B crossed out something that was completely wrong at the bottom of the page. That's what was what the TA found odd. Then Ashley had the exact same thing (lower left). They both wrote the Vittig reaction at the top above the problem which is also unusual. Dr. Knowles explained that the molecules can be drawn in any number of ways, so it was incredibly unusual that both students drew it the same. She added, "Also in the first step they both make up a base B in this reaction which was not given in the problem. You don't need that base, it's wrong in exactly the same way."

## Problem 5

Dr. Knowles said this was a generic problem where the students had to just fill in the box. She said, "There was not a lot to do here. Everything is the same except for the bottom. The scratch at the bottom of SIQ B's is not replicated on Ashley's. But the answer is the same."

## Problem 6

Dr. Knowles said, "This question is asking for the sequence of reactions. It's a blank page and you can do what you want. [Theirs] looks like a photocopy, same scratch out- just exactly the same." Dr. Knowles did note that SIQ B had the equation to the right top, but Ashley did not.

**Problem 7**

Dr. Knowles said, "This answer can be just words or both pictures and words. [The SIQs] used the exact same pictures and words. This one is more straightforward. The words are at the bottom and exactly the same words." Dr. Knowles said many different words could have been used but noted that both SIQs used the word "rendering."

**Problem 8**

Dr. Knowles said the SIQs answers look similar. She noted that there was a small difference in 8a. SIQ B has scratchwork which Ashley doesn't have. In 8e, Ashley had a different answer.

**Problem 9**

Dr. Knowles said that the placement is slightly different but both students wrote at the top of the page and did not use the whole paper. She noted, "The scratch work is the same and they got the same answer with the same notes."

**Problem 10**

(a) The students had the same answer with mostly the same responses and identical drawings."

(b) Dr. Knowles stated, "They show the flow of electrons in a pathway. [Both SIQs] are wrong in the exact same way and highly unusual. It is laid out unusual. Both made it more complex than it had to be."

**III. Interview Summary Lauren Harstad**

Lauren was interviewed by Jamie Sandman via Zoom on May 22, 2025 at 9:00 am and she stated as follows:

Lauren was the head TA for the course. She was in attendance at the beginning of the final which was on May 12, 2025 from 12:30-3:30 pm in McCosh 10. The students were directed to sit in every other seat. Lauren did not know where the SIQs sat but they both took the exam at the scheduled time.

Lauren participated in the exam grading with the other TAs and Dr. Knowles. She was assigned to grade question 4. The exams were in alphabetical order so she graded the SIQs' exams back to back. She first noticed an anomaly on SIQ B's exam. She explained, "SIQ B had a weird sequence of structures at the bottom of the page that had nothing to do with their answer at the top. I thought they were just trying ideas and forgot to cross it out but then I graded Ashley's exam and she had the same thing." Lauren brought the exams to Dr. Knowles to review. They then reviewed the SIQs' complete exams and the two exams were almost exactly the same. Lauren said, "In particular, one question had a narrative and their sentences were word for word the same." She noted that they also received almost the same score. Lauren also recalled that Ashley had a transcription error that was corrected later in her answer.

## IV. Witness Interview Summaries

### A. Witness A

Witness A was interviewed by Minh Truong and Ammaar Alam on May 30, 2025 at 10:00 pm. They stated the following:

Witness A said the class was difficult as expected. They attended all but 1-2 precepts and "as many lectures as [they] could." They said the final was "medium hard" but added they did not study as much as they would have liked. They reviewed their notes, PSets, textbook problems and practice exams which they said were the most important. They studied with Friend A, SIQ B, Witness C and Friend B but mostly alone due to a hectic finals schedule.

Before the final, Witness A went to Firestone to print their crib sheet. They then went to McCosh. They sat "on the left side of the room in the middle back." They sat with friends but they were spread out. SIQ B sat two seats to the left, Friend A sat in front of them, and Witness C and Ashley Kim sat behind them. They did not notice anything unusual during the exam. They used the entire time allotted and left with their friends.

Witness A said they used their crib sheet a little bit. They said, "You had to take the formulas and incorporate them." They did not think anyone could have copied based upon how the room was set up.

### B. Witness B

Witness B was interviewed by Minh Truong on June 3, 2025. They stated the following:

Witness B said the final was "challenging." They prepared by reviewing practice problems in Firestone Library. On the day of the exam, they were seated on the left side, towards the back, by the window if looking from the back of the room. Another female student was seated in their row, three seats away. Directly in front of them were "two asian girls" that they could not identify. In the row behind them was a blond woman.

Witness B said they did not notice anything unusual during the exam. They said people did get up occasionally to leave the room. They said they were "really focused on the exam" and were not paying attention to those around them.

### C. Witness C

Witness C was not able to be interviewed via Zoom due to their schedule. They stated the following via email:

Witness C said the exam was not as hard as expected compared to the previous exams. They studied by reviewing p-set problems and relevant questions from the textbook. They also did the practice exams for the final that the instructors posted and reviewed midterm exams. They mostly studied alone but sometimes collaborated on the p-sets with SIQ B and Witness A.

During the final exam, they sat on the left side of the room toward the back. SIQ B and Witness A were sitting close to them. They said, "I can't remember who else were [sic] near." They didn't notice anything unusual. They said the AC didn't work in the room that day so the fans were turned on, and it was loud. They said, "I sat toward the back so the sound of the fan probably covered everything." They did not think anyone near them got up and left during the

exam. They said, "I'm sorry I can't be more helpful. I was focused on being done with my last exam and didn't talk to or pay attention to anyone else other than my friends that day."

## V. SIQ Interviews

### A. Ashley Kim '27

Ashley was interviewed by the student and ODUS investigators on May 30, 2025 at 3:45 pm. She stated as follows:

Ashley said she had a "rough start" in CHM 304. After the second midterm, she received an email regarding her performance. She said she "got serious" after that notification and did much better on the last midterm and the final exam. She attended every precept and missed about four lectures during the semester.

Ashley prepared for the final exam on her own by attending review sessions and working on practice problems. She also met with Dr. Knowles approximately three times a week. She had lecture notes but said she did not use them to prepare for the final. She made a handwritten crib sheet and she studied during the process of making it. She threw her crib sheet away after the final but had notes on her iPad which she shared with the Honor Committee. She said she did not speak to any other students in the days leading up to the final.

Ashley arrived for the final exam early and alone. She sat "on the left side of the room near the big window in the middle rows." A few minutes after her arrival, her friends came and sat around her. She referenced Witness A and Friend A as sitting nearby. She recalled that Witness C sat to her left with one empty seat between them. Witness A sat in front of them. When asked about SIQ B Ashley said, "I think they were sitting two rows ahead." Ashley did not notice anything unusual during the exam. She stayed in her seat the entire time and used all of the time allotted.

Ashley was shown the evidence and said she was "scared." She said one explanation for the similarity could be that both students used the lecture notes posted on Canvas to prepare for the exam. Her immediate response was, "I couldn't have looked at her paper the way the seats are set up." She added, "I couldn't have looked at anyone's paper. There wasn't time." Ashley asked why she assumed the other SIQ was female. She said, "I just assumed the other student was female because all my friends are female." She continued, "Whoever was getting accused, there was simply no way to cheat. I really doubt anybody could have seen." She said behind her was a male student she did not know with red hair (later identified as Witness B). She thought there was a woman seated next to him.

Ashley said her process was to work on the problems in order. She said she had trouble with problems 3 and 10b and recalled skipping those and circling back to them at the end. She said the exam questions were quite similar to the final. She said her crib sheet contained "alot of drawings with patterns from the course." She added there were no words on the crib sheet, just structures.

Ashley said her work on the final was similar to the practice problems and PSet submissions. She said, "I went to Dr. Knowles with questions or if I was stuck. I put in alot of work." She said the way she wrote her answers on the final was consistent throughout the semester. She said

she did not erase unless she was running out of room and wrote small in case she needed to cross out so she would have space.

As to some of the similarities which Dr. Knowles noted, Ashley said, "There are little differences. Whether it was the other person or me getting accused, there was just simply no way. I wasn't keenly looking at others if they were looking at my paper but I was hunched over." She continued, "I didn't study with other people. I'm trying to think of ways. This wasn't planned at all. I didn't speak to others in the days leading up to the exam." She added that she did not notice anyone looking at her paper or standing up frequently.

Ashley said the practice problems she worked on were "quite similar" to the final. She said the way the questions are asked is the same, the components are just different. She said, "The way they are answered is similar and the way you think about them is similar."

Ashley sent follow up emails after this meeting to further explain her study habit changes and the effort she has put in for the third midterm and the final exam. These emails are included in the Drive.

### B.  SIQ B

The student and ODUS investigators met with SIQ B on May 30, 2025 at 2:30 pm.  SIQ B told us the following:

SIQ B attended every lecture and all but two precepts.  They did their PSets alone but spoke with friends if they had questions.  They also attended office hours during the semester.  They thought the final exam was a "fair assessment."  They prepared for the final by reviewing the lecture notes on Canvas and working on the practice problems and practice exams which were posted by the course instructors.  They also attended office hours and preceptor review sessions.  They had their own notes on the Good Notes app.  They did not use outside sources.  They studied independently until just before the final exam when they studied with two friends, Witness A and Friend A, for two days.  They said they studied with friends "to stay motivated."

On the day of the exam, SIQ B went to the library and then to the exam room.  They arrived about 40 minutes early for the exam.  They sat by the window in the middle of the room.  They sat near several friends who were all on the same CHM track.  Witness A Kim sat next to them with one empty seat between them.  Friend A sat in front of her.  Behind them sat Ashley Kim and Witness B.  SIQ B said they were not sure if they were one or two rows behind them.

SIQ B used the whole exam duration as did most students.  They said, "Everyone left at the same time."  They felt ok about most problems but recalled having an issue with one.  They said their strategy was "pattern repetition" and they tended to show all their work so that they might receive partial credit even if their answer was wrong.  They prepared a "cheat sheet" which was permissible.  They said they used it "a fair amount" because there was a lot of material to remember.  They do not believe their friends saw their cheat sheet.

SIQ B was shown the evidence in the case.  Their initial reaction was "shock."  They noted that their answer and Ashley's were "very similar" and they understood why it was raised as a "red flag."  Their initial theory was that maybe they had a similar crib sheet.  They said they did not know who the other SIQ was but that maybe they discussed their crib sheets.  SIQ B said their

crib sheet was very helpful and they spent a lot of time formatting it (SIQ B provided their crib sheet to the Honor Committee during the interview).

With regard to the allegations herein SIQ B stated, "I know for a fact that I never once looked anywhere but my own exam." They added, "I know my work on the exam was my own." They also said, "I was so focused on the exam I really didn't observe anything." They said that no one seated in front of them could have seen their exam. They said that both Witness B and Ashley were behind them but they didn't recall who sat where. They never left their seat during the exam. They said they were fixing answers and checking their work up until the point time was called. They then took their exam to the proctor desk and put it in the appropriate bin.

SIQ B said they had their notes from the practice problems they worked on and could provide them to the Honor Committee to show the similarities in their thought process between the practice problems and their final exam.

# EXHIBIT C

PRINCETON UNIVERSITY
Undergraduate Honor Committee
201 Nassau Street
Princeton, New Jersey 08544
honor@princeton.edu

TO: Regan Crotty, Dean of Undergraduate Students

FROM: Nadia Makuc '26, Chair of the Honor Committee

CC: Joyce Chen, Deputy Dean of Undergraduate Students

SUBJECT: Decision Summary for Ashley Kim '27

---

Dear Dean Crotty, June 16th, 2025

On Thursday, June 12th 6pm EST the Honor Committee heard via Zoom the case of
Ashley Kim '27 regarding a suspected violation of the Honor Code in CHM 304: Organic
Chemistry II. The Committee found Ms. Kim responsible for violating the Honor Code on the
final examination on May 13th. Specifically, Ms. Kim was found responsible for copying off a
peer's exam. The Committee recommends a penalty of suspension (not served). The following
letter includes the case information and the Committee's decision.

Summary of the Investigation

On May 15th the Honor Committee received a letter of accusation from Dr. Knowles,
who is one of three head professors for CHM 304: Organic Chemistry II. Two exams were
identified as being "almost identical in every written/drawn response (for all 10 questions)."
Student investigators Minh Truong '27 and Ammaar Alam '27 were assigned to investigate this
case, alongside ODUS investigator Jennifer Closser.

There are 163 students in this class, and the final occurred on Wednesday, May 14th from
12:30-3:30pm in McCosh 10. The course had three two-hour exams throughout the semester
(February 24th, March 31st, and April 23rd) and the final which was three hours. For each
exam, one 8.5"x11" piece of paper, double sided, could be brought with handwritten notes.
Since the lowest grade of the midterms is dropped, the remaining midterms are each worth 20%
of the final grade and the final exam is worth 35% of the final grade. The course also had
mandatory precepts and labs. Students were encouraged to study by using lecture notes

1

which drew on older and current textbooks. The final grade of the class is curved, and so precept participation would be taken into consideration if a student's grade was on the edge of two letter grades. This course was preceded by CHM 301: Organic Chemistry I which followed a similar exam structure.

After the first two exams, Ms. Kim received an academic alert that she had poor performance in the class such that she may receive a D or F in the class. She was contacted by the Assistant Dean of Studies from her residential college regarding this on April 4th, who extended the P/D/F deadline since it fell on that day. Over the next four and a half weeks leading up to the exam, Ms. Kim had twelve meetings scheduled with Prof. Knowles to study. After the academic alert, Ms. Kim studied significantly more, which mainly consisted of using past exams which had been provided by the faculty to practice. Ms. Kim attended every precept, and missed about four lectures during the semester. Ms. Kim studied for the final exam on her own, and did not speak to any other students in the class about the final in the days leading up to the exam.



*Figure 1.*

On the day of the exam, Ms. Kim arrived to the exam early and by herself. She recalled sitting on the left side of the room near the window. She recalled that people whom she knew sat around her. During the interview with investigators, Ms. Kim identified by name that Witness C sat to her left with one empty seat between them and that Witness A sat in the row in front of her. When asked about SIQ B, Ms. Kim said "I think she was sitting two rows ahead." Ms. Kim also described Witness B, whom investigators were able to identify. Ms. Kim said that she did not notice anything unusual during the exam. Ms. Kim had handwritten her note sheet and no longer had it by the time of the interview.

2

Witness A said they studied with Friend A, SIQ B, Witness C, and another friend. They recalled that SIQ B sat two seats to the left of them, Friend A sat in front of them, and Ms. Kim and Witness C sat behind them. Witness A said that they did not notice anything unusual during the exam.

Witness B recalled that there were "two asian girls" that they could not identify in the row in front of them (Ms. Kim and Witness C). They said they did not notice anything unusual during the exam, but noted that they were very focused during the exam.

Witness C studied with SIQ B and Witness A. Witness C recalled studying using the previous exams posted by the professors. They recalled that SIQ B and Witness A were sitting close to them. They said they did not notice anything unusual during the exam. They noted that the air conditioning did not work and that there were some loud fans. They noted that they were very focused during the exam.

SIQ B attended every lecture and all but two precepts as well as office hours throughout the semester. They studied for the exam by reviewing lecture notes and using the practice problems and previous exams provided by the faculty. They studied with Witness A and Friend A the two days prior to the exam to "stay motivated," but they recalled that most of the studying had to be done individually. They arrived forty minutes early for the exam. They entered the room with Witness A, and recalled Ms. Kim sitting down near them.

When asked about who was sitting near, SIQ B also identified Friend A as sitting in front of them, and noted Ms. Kim's proximity, however they could not recall if Ms. Kim was one or two rows behind. They said that they did not notice anything unusual during the exam, and they noted that they were very focused during the exam. SIQ B is right handed, but was sitting at a chair with a left-handed desk. SIQ B had their note sheet on their lap during the exam. SIQ B made their note sheet on their iPad and then printed it out, and so provided it to the Committee for review. SIQ B said they did not leave their seat during the exam and was working on it up until time was called.

The exams are arranged in alphabetical order for grading, so that the grades can be more easily entered into the system. Each faculty member is assigned a question which they grade for all students. While grading, TA Lauren Harstad was assigned to question 4. SIQ B's exam was directly in front of Ms. Kim's for the order of grading. TA Harstad first noticed a "weird sequence of structures on the bottom of the page that had nothing to do with the answer at the top" on SIQ B's exam. She was surprised to find this on Ms. Kim's as well. TA Harstad brought the exams to Dr. Knowles for review, at which point they noticed these similarities:

Problem 1: (b) the scratch work is nearly the same and in the same location. (d-f) answers have almost the same wording. Scratch work is the same and in the same location.

3

Problem 2: (a) Same drawing in the same pattern. Dr. Knowles noted that Ms. Kim had a "transcribing error," since an error was made which is not uncommon, but was self-corrected on the next line. (b) Same scratch work crossed out on both exams. The answer is written in the same pattern and the molecules have the same placement.

Problem 3: Similar drawings, drawn in the exact same configuration and placement on the page with the same notes. Both include the name of the reaction, which not every student did.

Problem 4: SIQ B and Ms. Kim both crossed out something completely wrong on the bottom of the page. Both name the reaction at the top of the page, which is unusual according to Dr. Knowles. In the first step, Dr. Knowles commented that both "make up a base B in this reaction which was not given in the problem - you don't need that base, it's wrong in exactly the same way."

Problem 5: Although this is more of a generic problem, "everything is the same except for the bottom." SIQ B's scratch work does not appear on Ms. Kim's exam.

Problem 6: SIQ B has an equation on the top right which is not on Ms. Kim's, however Dr. Knowles said otherwise it "looks like a photocopy, same scratch out - just exactly the same."

Problem 7: The answer could be words, pictures, or both. Both SIQ B and Ms. Kim used "the exact same pictures and words" according to Dr. Knowles.

Problem 8: The answers look similar, though in 8a SIQ B has scratchwork that Ms. Kim does not have, and in 8e Ms. Kim had a different answer.

Problem 9: The placement is slightly different, but similar, and yielded the same answer with the same notes.

Problem 10: (a) The answers are the same with the same drawings. (b) Dr. Knowles stated, "they show the flow of electrons in a pathway. [Both SIQs] are wrong in the exact same way and highly unusual. It is laid out unusual. Both made it more complex than it had to be."

Dr. Knowles recalled that during the grading process these were referred to as the "twin exams." Dr. Knowles has taught the course for four years and she noted that only once before were there such similarities, and that case had also been brought to the Committee for investigation.

SIQ B had access to two of three of their midterms and so was able to provide them to

the Committee for review. Ms. Kim no longer had access to her midterms. Both SIQ B and Ms. Kim provided various study materials to the Committee for review.

When asked about the similarities, SIQ B said their initial reaction was "shock" and understood why the exams were a "red flag." SIQ B, unaware of the identity of the other student in question, initially thought that perhaps there were similar note sheets since she had discussed

4

making the note sheet with some other students. SIQ B later clarified that Ms. Kim was not one of the students whom she discussed the note sheet with.

When asked about the similarities, Ms. Kim said she was "hunched over" and that "whether it was the other person or me getting accused, there was just simply no way." She mentioned that the practice problems were similar to the final, and that similar thought processes could explain the similarities. Ms. Kim also sent a follow up email to the Committee explaining the changes in her study habits.

Throughout the investigation, investigators met with Dr. Knowles, TA Harstad, Ms. Kim, SIQ B, Witness A, Witness B, and received email testimony from Witness C. The Committee also collected two sample exams as controls.

Hearing

The Honor Committee convened for a hearing on June 12th, at 6:00pm EST via Zoom. The following members were appointed by the Chair to sit on the hearing:

Nadia Makuc '26, Chair
Daniel Zayas '26
Geneveive Shutt '26
D'Schon Simmons '27
Haley Hoffman '27
Fatima Sheriff '28
Thomas Hasty '28

Minh Truong '27 was present for the hearing as the student investigator assigned to this case. Student investigator Ammaar Alam '27 was absent from the hearing. Ms. Kim and her peer representative Sophia Zuo '27 were also present at the hearing.

During the hearing, the Honor Committee heard an opening statement from Ms. Kim, and then Prof. Knowles joined to answer questions from Committee members. Prof. Knowles explained the variability expected from answers on Organic Chemistry exams, that, even if the answers are the same, regarding the style of the answers, "by and large there is a lot of variability from one student's response to another student's response to another student's response," and later that she was "surprised at the level of fidelity between the two exams." She noted that there

were similarities not only in the drawing, but also in the written responses, and said that she and the other instructional staff felt that they were "as similar as they could be."

Regarding the scope of the possibility of answers and their correspondence to study material, Dr. Knowles explained how even having the same study material would not necessarily yield the same answers because of the breadth of possibilities.

5
*Figure 2.*



While screen sharing the copies of the exams, Dr. Knowles walked the Committee through question 8 noting the scratch work at the bottom, and explaining how there was a variety of answers possible, but the two exams had the same answers. On question 10, the top part is sectioned off with staircasing, and the arrows and organization were described as being "exactly identical" (figure 2). This staircasing organization can also be seen in the previous exams of SIQ B, such as exam 1, problems 4 and 5 (figures 3 and 4). It was noted in this problem how there was one spot on Ms. Kim's exam which was illogical (an arrow starting at the place of a plus charge, when it only could have been a negative charge), which "seemed like an error of copying," since this was then corrected in the next step.

*Figure 3. Figure 4.*



When asked about whether these similarities were just noticed because SIQ B and Ms. Kim's exams were graded back-to-back, Prof. Knowles negatively. She noted that because each grader grades only one question, if an irregularity comes up twice, graders are responsible for administering a similar grade, and so they keep an awareness of errors. She referenced another instance which was referred to the Honor Committee when exams were not graded one after the other.

6

In response to being asked by Ms. Zuo, the peer representative, whether it was possible for Ms. Kim to have naturally improved to such a grade, Dr. Knowles responded that she hoped meeting with Ms. Kim did help, and since it is a cumulative final she could not "rule out" improvement. Dr. Knowles finished her response by saying, "regardless of if it was [Ms. Kim] or not, just looking at the exams, it looks like this was not authentic work." Dr. Knowles said that, in comparison to the previous three exams, Ms. Kim did "remarkably well." Based on her final, Ms. Kim would have received a 'B' - prior to the final she would have been "at best 'C'."

When asked about the exam styles in comparison to the previous exam solutions which are provided, Dr. Knowles explained how she typically does write the answers left-to-right and down-and-over, but not left-to-right and down, as the exams in question were written. She noted that most start left-to-right, but then can vary a lot and often are a matter of fitting into the space.

Ms. Kim inquired about the similarity of the handwriting, and whether this was an explanation for the similarities. Dr. Knowles responded that the similarities are "moreso about the content of the drawings themselves and less so about the size because we see all sort of handwritings and size," and she remarked that in general, the most telling factors are specific mistakes and the arrows. Dr. Knowles then left the call, and Ms. Truong led the Committee in an evidence review, as described in the summary of the investigation above.

Ms. Kim then shared a presentation in which she remarked on the work she had put into the course, the room layout, the lack of witness testimony to unusual behavior, and the ability to explain her thought processes on each of the exam questions.

When asked specifically about the irregularity on question 4 which occurs at the bottom of the page (figure 5), Ms. Kim stated that she tried the structure at the bottom first, and then wrote what was above as another and final attempt. She said she did not cross it out because she knew it was not going to be correct and wanted to try to get partial credit. When asked about the question during a separate hearing, SIQ B explained that this was written as an additional part of the answer which they thought was part of the answer at the time.

*Figure 5.*



7

When asked specifically about the crossed out section on question 6 (figure 6), Ms. Kim said that she had started to answer, determined it was wrong, and wrote her second and final attempt above. Most of Ms. Kim's answers start directly in the top left. When asked about the question during a separate hearing, SIQ B explained that they were double checking the order of the reaction and so worked out their work underneath the answer, and having found that it did 'check out,' crossed it out.

*Figure 6.*



When asked about the order in which she completed the exam, Ms. Kim said that she mainly went in order, except for if there were any particularly challenging parts which she may have skipped and went back to only if there was time. During the investigation, she mentioned that she had trouble with problems 3 and 10b, and circled back to them at the end. The open section of the hearing closed at 8:23pm EST.

Responsibility
By a 7-0 vote the Committee found Ms. Kim responsible for a violation of the Honor Code. The Committee discussed at length the facts of the case, and determined that the evidence showed that copying had occurred.

8

The Committee held discussion as to whether it was an act of collaboration, however ultimately determined that it was not. The lack of connection between SIQ B and Ms. Kim and the lack of suggestion from either student in question, alongside the lack of evidence to suggest that such an act occurred, meant that there was no evidence to support this theory or reason to believe that it occurred.

The Committee considered the mechanics of how copying could have happened, and explored all possibilities. While Ms. Kim had said that she was seated two rows behind SIQ B, no other students interviewed indicated two rows, but rather referred to the row behind. SIQ B could not recall if Ms. Kim was one or two rows behind, however, Witness B, Ms. Kim, and Witness C confirmed that Witness C and Ms. Kim were in the same row, and SIQ B indicated that Witness C was in the row behind them (cf. figure 1). Ms. Kim had also said that Witness A was in the row in front of her, and SIQ B was able to confirm, alongside Witness A, that Witness A and SIQ B were in the same row.

Ms. Kim also said that Witness B was seated to her left, however no other student interviewed was able to specify the order of that row. Based on the lack of corroboration, and that Ms. Kim said she came earliest and then other students sat down around her, the Committee also considered whether Ms. Kim could have been seated directly behind SIQ B. SIQ B is right handed and recalled that the desk was a left-handed desk, the Committee considered that they therefore could not have been entirely hunched over their exam - SIQ B also described themself as "very short."

When asked, Witness A had said they did not think it would have been possible to copy off a student a row in front, as Ms. Kim suggested in her testimony, however a student on the Committee who took the very same exam voiced that it would have been possible to see an exam from the row in front. The slant of McCosh 10 was also taken into consideration as a facilitator for viewing. Other students on the Committee familiar with the room, and with typical exam conditions determined that not only would copying have been possible from either configuration, but also that it was the only possible explanation.

The lack of testimony from other witnesses was considered, however, all students interviewed remarked how focused they were on their exams, and Witness C remarked how there was no air conditioning so it was extremely hot, and one fan which was extremely loud, which further contributed to the environment which might have prevented anyone from noticing anything.

Ultimately, the Committee found that even in absence of certainty about the exact method, the standard of "documented evidence and plausibility of method" was met (*Honor Constitution* art III. §D.3.a.ii). The Committee determined that there was no other reasonable explanation for such similarities.

9

Penalty

By a 5-2 vote the Committee recommended a penalty of suspension (not served). The Committee weighed the factors which affected the severity of this violation and balanced this with Committee precedent. The most recent instance of copying in Committee history occurred before revisions to penalty in 2019 - and so had received a one semester suspension - but the Committee did not think that separation from the University was required considering that this was a first-time violation and that it was a single violation.

Presented with the other options, the Committee considered how this was analogous to using an unauthorized resource, but among all resources to access, it was rather serious because it a.) was access to the answers themselves (as opposed to merely notes which aid in solving) b.) implicated an innocent student c.) claimed another student's work to be their own. The Committee feels that, as an agreement among and for students, the Honor Code should be especially respectful for preserving and maintaining the integrity of a student's exam from being copied by another. Therefore, the majority of the Committee opted for suspension (not served).

The Committee members who voted in favor of Disciplinary Probation considered uncertainty about the magnitude of the advantage gained.

———————————————————

I fully support the Committee's findings of responsibility and its penalty recommendation of suspension (not served). I submit this letter as a summary of the Committee's investigation and hearing process and its recommendation for penalty.

Sincerely,

# Exhibit B

## Chancery Case Summary

**Case Number:** MER C-000078-25

**Case Caption:**  Kim Vs The Trustees Of Prin Ceton Uni V

| | | |
|---|---|---|
| **Court:** General Equity | **Venue:**  Mercer | **Case Initiation Date:**  08/07/2025 |
| **Case Type:** Injunction-Other | **Case Status:**  Active | **Case Disposition:** Open |
| **Case Track:** | **Judge:** | |

| Plaintiffs | | |
|---|---|---|
| **Ashley  Kim** | | |

| | | |
|---|---|---|
| **Party Description:** Individual | **Phone:** | |
| **Address Line 1:** | | |
| **Address Line 2:** | | |
| **City:** | **State:** NJ | **Zip:** 00000 |
| **Attorney Name:** Stephen J Edelstein | | **Attorney Bar ID:** 285031972 |
| **Attorney Email:** SEDELSTEIN@WEINER.LAW | | |

| Defendants | | |
|---|---|---|
| **The Trustees Of Princeton Univ** | | |

| | | |
|---|---|---|
| **Party Description:** Business | **Phone:** | |
| **Address Line 1:** | | |
| **Address Line 2:** | | |
| **City:** | **State:** NJ | **Zip:** 00000 |
| **Attorney Name:** | | **Attorney Bar ID:** |
| **Attorney Email:** | | |

| ACMS Documents | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Filed Date** | **Doc Number** | **Document Type** | **Filing Party** | **Doc Status** | **CO ID** | **Type** | **Date Served** | **Service Status** | **Party Served** |
| 08/07/2025 | 001 | COMPLAINT OTSC | KIM | | | | | | |
| 08/07/2025 | 002 | MTN ORD SHO CAU | KIM | PG | | | | | |

| Case Actions | | | |
|---|---|---|---|
| **Filed Date** | **Docket Text** | **Transaction ID** | **Entry Date** |
| 08/07/2025 | Verified Complaint for MER-C-000078-25 submitted by EDELSTEIN, STEPHEN J, WEINER LAW GROUP LLP on behalf of ASHLEY KIM against THE TRUSTEES OF PRINCETON UNIV | CHC2025252523 | 08/07/2025 |